# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| LIST INDUSTRIES, INC., | : | |
| | : | |
| Plaintiff, | : | Case No. 3:18-cv-199 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| DEAN SCOTT UMINA, *et al.*, | : | |
| | : | |
| Defendants. | : | |

---

## ENTRY AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT OF DEFENDANT DEAN SCOTT UMINA (DOC. NOS. 51 AND 52) AND DENYING MOTION FOR SUMMARY JUDGMENT OF DEFENDANT TOP TIER STORAGE PRODUCTS, LLC (DOC. NO. 53)

---

Plaintiff List Industries, Inc. ("List") brings three claims in this diversity case: (1) violation of the Ohio Uniform Trade Secrets Act ("OUTSA"); (2) breach of contract; and (3) spoliation. (Doc. No. 35.)  All three claims are brought against Defendant Dean Scott Umina ("Umina"), while only the first and third are brought against Defendant Top Tier Storage Products, LLC ("Top Tier").  Pending before the Court are two related motions for summary judgment, one filed by Umina (Doc. Nos. 51 and 52) and the other filed by Top Tier (Doc. No. 53) (collectively, the "Motions").[1]  In the Motions, the Defendants move for an order granting summary judgment on all claims against them, pursuant to Federal Rule of Civil Procedure 65.  In response, List argues that the Court must deny the Motions because there are disputed issues of material fact.  As explained below, the Court finds that all of the claims survive, although certain documents cannot support the trade secret claim.  The Court **DENIES** the Motions.

---

[1] Throughout this order, the Court will refer to Umina and Top Tier, collectively, as the Defendants.

## I. **BACKGROUND** [2]

### A. **List Acquires the Midwest Entities in 2010**

List was founded in approximately 1936 and, among other things, is involved in the business of manufacturing and distributing storage lockers and other storage products. (Doc. No. 49 at PageID 2184.) Similarly, the Midwest Entities[3] assembled and sold lockers and other industrial storage products. (Doc. No. 35 at PageID 409; Doc. No. 46 at PageID 630.) Umina was one of the owners of the Midwest Entities. (Doc. No. 46 at PageID 632.) Thom Champa, List's Senior Vice President of Sales and Marketing, saw value in List acquiring the Midwest Entities' customer base because the Midwest Entities "were long established" on the industrial side of the business in Indiana, Kentucky, Pennsylvania, and Illinois, and had "expanded their customer base coast to coast." (Doc. No. 50 at PageID 2700, 2705-06.)

In 2010, List and the Midwest Entities executed a Purchase and Sale Agreement (the "PSA"). (Doc. No. 49-2.) The PSA became fully executed on August 13, 2010. (*See id.* at PageID 2240, 2242-43.) Through the PSA, List (the Buyer) purchased the real property and substantially all of the assets of the Midwest Entities (the Sellers). (*Id.*) Among other provisions and exhibits, the PSA states the following:

> … **RECITALS** …
>
> Buyer desires to purchase and Sellers desire to sell to Buyer, (i) the Real Property, and (ii) all or substantially all of the assets of the Business, as more particularly described herein, in accordance with and subject to the terms, conditions and provisions hereinafter set forth.
>
> …

---

[2] For purposes of resolving the Motion, the recitation in the "Background" section includes undisputed facts and otherwise assumes the evidence of the non-moving party as true and draws all reasonable inferences in the nonmoving party's favor, as is appropriate at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Tolan v. Cotton*, 572 U.S. 650, 660, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014).

[3] Specifically, the Midwest Entities for purposes of this order are: Midwest Factory Warehouse, Inc.; FamousLockers, LLC; Pinnacle Storage Products, LLC; and SUDS Ventures, LLC.

1.2     The Assets.

1.2.1  The assets to be sold by Seller to Buyer pursuant to this Agreement consist of the following:

1.2.2  All or substantially all of the assets owned by Seller in connection with the ownership and operation of the Business, as set forth on Exhibit C-1 attached hereto (the '**Assets'**). …

The foregoing, with the exception of the assets ('**Excluded Assets'**) set forth on Exhibit C-2 attached hereto, is hereinafter collectively referred to as the '**Assets**'. The Real Property and the Assets are collectively referred to as the '**Property**'.

…

4.2.1  Assets.  Seller shall transfer good title to the Assets to Buyer, by a duly executed Bill of Sale (the '**Assets Bill of Sale**') with warranties of title, free and clear of all liens, encumbrances, security interests and adverse claims of any kind or nature whatsoever.

…

9.1  Procedure.  Seller and Buyer shall cause the following to occur at the Closing on the Closing Date:  … (b) SUDS and/or each Seller, as applicable, shall as of the Closing Date, execute and deliver to Buyer (i) the Personal Property Bill of Sale, (ii) the Assets Bill of Sale …

….

(*Id.* at PageID 2225, 2226, 2228, 2236 (emphasis in original).)  Exhibit C-1 to the PSA, under the

heading "Assets," states, in part:

3.  All equipment, orders not yet shipped, contracts, computer software, company names, tradenames, copyrights, marketing materials, patents, websites and other intellectual property of each Seller; a schedule thereof to be provided by Seller to Buyer 5 days from the Effective Date and updated at Closing.

(*Id.* at PageID 2249.)

The Bill of Sale between List (as Assignee) and the Midwest Entities (as Assignor), which

is referenced in Section 4.2.1 of the PSA, is dated October 11, 2010 and states, in part:

NOW, THEREFORE, … Assignor does hereby ASSIGN, TRANSFER, SET OVER, and DELIVER to Assignee, its successors and assigns all of Assignor's right, title, estate and interest, if any, in and to the following items (the 'Assets'), as more particularly set forth on Exhibit 'A' attached hereto made a part hereof …

EXHIBIT 'A'

> … 3.  All equipment, contracts, computer software, marketing materials, patents, websites and other intellectual property of each Seller; a schedule of the equipment is set forth on Exhibit 'C' attached hereto and made a part hereof.  …

(Doc. No. 49-4 at PageID 2265, 2267.)  Exhibit 'C' of the Bill of Sale includes the Midwest Entities' servers, such as the POWEREDGE 600SC Server and the POWEREDGE Server SC420. (*Id.* at PageID 2276; Doc. No. 49 at PageID 2188.)

## B.  List Employs Umina for Six Months

The day after executing the Bill of Sale, Umina and List entered into an employment agreement (the "Employment Agreement").  (Doc. No. 49-3; *see also* Doc. No. 35-1.)  Through the Employment Agreement, Umina agreed to become List's employee, with a salary of $70,000 over a six-month period, the potential for a bonus, and the possibility that List would renew the agreement after the initial six months at an increased annual salary.  (Doc. No. 49-3 at PageID 2259.)

The Employment Agreement between List (as Company) and Umina (as Employee) is dated October 12, 2010 and states, in part, the following:

> 7.  Nondisclosure of Confidential Information Concerning Business.  The Employee shall not at any time, whether during or after his Employment under this Agreement, either directly or indirectly, divulge[,] disclose, or communicate to any person, firm or corporation any information relating to the business or affairs of the Company which is confidential, proprietary, or not in the public domain.  In the event of a breach of the provisions of this section, the Company shall be entitled to an injunction restraining the Employee from such disclosure.
>
> …
>
> 9.1  … Upon termination of employment, the Employee shall return all property, materials, files and any other Company owned information to the Company.

(Doc. No. 49-3 at PageID 2259, 2261.)

Umina's employment with List only lasted for the initial six-month period, ending in April

of 2011.  (Doc. No. 46 at PageID 649.)  Umina admitted during his deposition that, at some point while he was employed by List, he downloaded files.  (*Id.* at PageID  649-50.)  He testified that those files were downloaded from the servers at the Midwest Factory Warehouse onto a Seagate hard drive (the "Seagate Hard Drive").  (*Id.*; *see also* Doc. No. 51 at PageID 3080 (Defendants acknowledging that, on March 24, 2011, Umina copied documents stored electronically and used by the Midwest Entities); Doc. No. 63 at PageID 3784 ("Umina acknowledges copying information to his Seagate hard-drive in March 2011 before his brief employment stint with List ended").)  Umina admitted that those servers "were part of the purchase" and "after the sale were owned by List."  (Doc. No. 46 at PageID 650.)  Umina also admitted that he purchased the Seagate Hard Drive after November 23, 2010, which was <u>after</u> execution of the PSA and the Employment Agreement.  (Doc. No. 62-1 at PageID 3749; Doc. No. 49-2 at PageID 2240, 2242-43; Doc. No. 49-3.)

The PSA had identified the Midwest Entities' accounts receivables that existed at the time of closing as the (only) "Excluded Assets" in the purchase by List.  (Doc. No. 49-2 at PageID 2226, 2250; Doc. No. 49 at PageID 2186.)  Umina explained:  "I took documents that I felt that I needed to conclude [the remaining open business with the Midwest Factory Warehouse at the end of his employment with List] with our customers, accounts receivable, things of that nature."  (Doc. No. 46 at PageID 650.)  In essence, he said that he took information "in order to wrap up or wind up" the four entities (i.e., the Midwest Entities) that had sold their assets to List.  (*Id.*)  However, Umina "didn't know what [he] would need, so [he] didn't pick the documents that [he] thought [he] might need," resulting in him "basically download[ing] a drive of files."  (*Id.* at PageID 650-51.)  Umina could not remember whether he had asked anyone at List if it was okay for him to download that information from the servers and take it with him.  (*Id.* at PageID 650.)

### C. **Top Tier is Formed in 2016**

Umina testified that, in March of 2011 while his employment with List was ending, he did not think that he might start another materials handling equipment company in the future. (Doc. No. 46 at PageID 651.) However, in late 2015, Todd Gillis, a former colleague of Umina, approached Umina about getting back into the storage locker business. (*Id.* at PageID 651.) Umina agreed, he helped to form Top Tier in February of 2016, and he became a Top Tier employee thereafter—running the company's day-to-day operations. (*Id.* at PageID 651, 653.) Among other things, Umina hired former Midwest Entities employee, Kevin Krumholtz ("Krumholtz"), for Top Tier. (*Id.* at PageID 653-54.) Umina and Krumholtz began putting together a business plan for Top Tier—including finding customers and creating mailing lists of potential customers. (Doc. No. 47 at PageID 1619; Doc. No. 46 at PageID 627.) Umina contributed to putting together a customer list for Top Tier while it was in the process of being formed. (Doc. No. 47 at PageID 1627.)

During the time that Top Tier was being formed, Umina had a hard drive that Krumholtz acknowledged might have contained some Midwest Entities files. (Doc. No. 47 at PageID 1623-24.) Umina used some pictures for Top Tier that may have come from that hard drive. (*Id.*) Additionally, Umina admitted that he used information contained on the Seagate Hard Drive to identify potential customers for Top Tier's products. (Doc. No. 62-1 at PageID 3762.) Umina also testified that he looked at four files from the Seagate Hard Drive in creating an email list for Top Tier and that he used some of the information from those four files. (Doc. No. 46 at PageID 680.) He could not recall using any more than those four files to identify potential customers for Top Tier's products. (*Id.*) Umina also acknowledged that he used a OneDrive cloud storage service in his work for Top Tier. (Doc. No. 46 at PageID 658-59.) He could not recall whether he ever uploaded any documents from the Seagate Hard Drive to that cloud storage service. (*Id.*)

D. **The Florida Lawsuit and Umina's File Storage Device(s)**

List soon found out about Top Tier's existence. List's counsel sent Umina a preservation letter dated July 1, 2016 (the "Preservation Letter"), which Umina received and read. (Doc. No. 46-2; Doc. No. 46 at PageID 661.) Among other things, the Preservation Letter accused Umina of violating his agreements with List and provided "notice to retain and preserve any and all information that may be relevant to any forthcoming litigation." (Doc. No. 46-2 at PageID 734.)

On November 29, 2016, List filed a lawsuit against Top Tier, Umina, and another individual in Florida state court. (Doc. No. 51-5.) Among other claims, that Florida lawsuit included counts against Umina for breach of his employment agreement with List and for conversion. (*Id.*) A 2018 deposition of Umina in the Florida litigation included the following exchange:

> Q. What other – now, this computer at home, is it the same computer you used at Midwest when you were – when it was your company or is it –
>
> A. No.
>
> Q. – a List computer?
>
> A. No. It was a personal hard drive that I used. Back then we didn't have a Cloud and I just used – I had a hard drive that I took files back and forth from work to home.
>
> Q. You had like a portable hard drive?
>
> A. Yes.
>
> Q. What's the brand of the portable hard drive?
>
> A. I want to say Toshiba but I'm not a hundred percent sure.
>
> Q. Okay. And where is this portable hard drive?
>
> A. It's at my home.
>
> Q. All right. … it's critically important that you not overwrite, damage, destroy, modify the data on that hard drive, okay? Any questions? Is that clear?

7

A.  I understand.

Q.  In addition to – would all of the documents that you would have had in relation to your prior employment at Midwest Factory, would they be included on that portable hard drive?

A.  To the best of my knowledge, yes.

(Doc. No. 33-2 at PageID 367-69.)

On May 1, 2019, this Court ordered Defendants to provide List's expert witness, Dr. Andrew T. Cobb ("Dr. Cobb"), with access to a hard drive in Umina's possession and the laptop and desktop that Umina had identified as being used to access that hard drive's contents.  (Doc. No. 24.)  Defendants did so, along with a USB flash drive.  According to Dr. Cobb, he inspected and analyzed four devices belonging to Umina: Seagate Hard Drive; HP laptop; Dell desktop; and USB flash drive.  (Doc. No. 62-4 at PageID 3774.)  Dr. Cobb's analysis revealed that Umina's Seagate Hard Drive was accessed in 2016, 2017, and 2018, and revealed that the OneDrive cloud storage service was accessed by Umina's laptop and desktop on 190 occurrences starting in 2017. (*Id.* at PageID 3775.)  Dr. Cobb stated that his "opinions in this case do not foreclose the possibility that any particular file on the Seagate Hard Drive was accessed from either the Dell Desktop or HP Laptop."  (*Id.*)

Dr. Cobb's analysis of the four devices also revealed the existence of a fifth device: a Toshiba USB device.  (Doc. No. 62-4 at PageID 3774.)  That Toshiba device is different from the Seagate Hard Drive.  (*Id.*)  However, Defendants deny that Umina ever possessed or used a Toshiba USB device.  (*See, e.g.,* Doc. No. 62-1 at PageID 3762; Doc. No. 46 at PageID 625.) Defendants assert that, during the 2018 deposition in the Florida litigation, "Umina mistakenly referred to the device as a Toshiba" when it was actually the Seagate Hard Drive.  (Doc. No. 51 at PageID 3083.)

Dr. Cobb also detected "a number of files" that were located on the Toshiba device and

accessed from Umina's desktop or laptop on October 14, 2016.  (Doc. No. 62-4 at PageID 3774-75.)  This would have been more than three months after the date of the Preservation Letter.  (*Id.*; Doc. No. 46-2.)  Dr. Cobb also determined that the Toshiba device was in use as far back as 2006.  (Doc. No. 62-4 at PageID 3774, 3778.)

### E.  The Complaint and Motions

List filed this action on June 6, 2018.  (Doc. No. 1.)  On August 6, 2020, List filed its Amended Complaint (the "Complaint") to include the spoliation claim.  (Doc. No. 35.)  On January 21, 2021, Umina and Top Tier filed the Motions, in redacted form (Doc. No. 51) and unredacted form (Doc. Nos. 52, 53).  In response, List filed a combined memorandum in opposition to the Motions (the "Opposition") in redacted form (Doc. No. 62) and unredacted form (Doc. No. 61).  Defendants then filed a joint Reply in support of the Motions (the "Reply").  (Doc. 63.)  The Motions are fully briefed and ripe for review.

## II.     LEGAL STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, that it believes demonstrate

the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The burden then shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There

must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is "whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## III. ANALYSIS

As mentioned above, Umina and Top Tier seek summary judgment on all claims against them.

### A. Violation of the OUTSA (Count 1)

The first count in the Complaint is for violation of the OUTSA, which is found at Ohio Rev. Code §§ 1333.61 through 1333.69. (Doc. No. 35 at PageID 414-15.) Under Ohio law, "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined," and, subject to an exception, "a complainant in a civil action is entitled to recover for misappropriation" of a trade secret. Ohio Rev. Code §§ 1333.62(A), 1333.63(A). "Misappropriation" and "trade secret," among other terms, are defined by statute. Ohio Rev. Code § 1333.61.

Defendants argue that "List cannot prove [1] it owned the documents at issue or [2] that Umina used or disclosed any alleged trade secrets." (Doc. No. 51 at PageID 3077.) List responds that "[a]n issue of fact exists as to whether Defendants misappropriated List's trade secrets." (Doc. No. 62 at PageID 3736.) List also points out that Defendants do not dispute that Umina—who also served as Top Tier's designated Rule 30(b)(6) deposition witness—is an agent for Top Tier and that any alleged use of trade secret information would have been for Top Tier's benefit. (*Id.*; Doc. No. 59 at PageID 3266.)

Throughout its briefing, List blurs the lines between the files/information/documents that are relevant to each of its three separate claims. This is significant because the scope of what constitutes a "trade secret" for purposes of List's trade secret claim is narrower than the scope of "information" subject to Umina's Employment Agreement for purposes of List's breach of

contract claim and is different from the scope of "evidence" relevant to List's spoliation claim.

Some of List's Opposition attempts to cast a very wide net in identifying the alleged trade secrets at issue. (*See, e.g.,* Doc. No. 62 at PageID 3713 (appearing to argue that the alleged trade secrets include all of "the information Umina downloaded from List's servers to his personal hard drive").) Other portions of List's Opposition brief are quite vague in identifying the alleged trade secrets. (*See, e.g., id.* at PageID 3723 (stating that "there are hundreds of files that Umina downloaded from List's servers to the Seagate Hard Drive" and complaining that "Defendants' contention that List's trade secrets claims revolve solely around those four documents is erroneous").) However, List does not attempt to show that all the information it references in such statements actually qualifies as a trade secret under Ohio law. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 1999-Ohio-260, 707 N.E.2d 853, 862 (Ohio 1999) ("a claimant asserting trade secret status has the burden to identify and demonstrate that the material is included in categories of protected information under the statute").

Yet, in one of its interrogatory responses, List identified "the information List contends constitutes a 'trade secret'" in this case, and discovery is now complete. (Doc. No. 52-6 at PageID 3224-26; *see also* Doc. No. 62 at PageID 3722-23.) In that interrogatory response, List identifies twelves documents, which—to be more precise—are electronic files. (*Id.*; Docs. Nos. 49-5 through 49-16 (deposition exhibit numbers 5 through 16 of List's Rule 30(b)(6) witness).) The Court finds that those twelve documents constitute the alleged trade secrets in this case.

### (1) Ownership of the alleged trade secrets

The Defendants first argue that "List must have an interest in (*e.g.* ownership) or some right to what it alleges are trade secrets," and that the List's claim fails because List "does not own or otherwise have an interest in the alleged secret[s]." (Doc. 51 at PageID 3088.) More

specifically, Defendants argue that "[b]ecause [the parties to the PSA] did not identify any assets in the separate schedule [i.e., Schedule C-1.3], the 2010 Purchase did not include any 'intellectual property (*e.g.* trade secrets), to the extent it even existed." (*Id.* at PageID 3080.)

List does not take issue with the legal premise that it must have an interest in, or some right to, the alleged trade secrets. *See also Fred Siegel Co., L.P.A.*, 707 N.E.2d at 862 (indicating that the party asserting trade secret misappropriation must be a "possessor" of the alleged trade secret); *RPM, Inc. v. Oatey Co.*, 2005-Ohio-1280, at ¶ 15 (Ohio Ct. App. 2005) ("to bring a claim for misappropriation of trade secrets, one must either own or have possession or a right to control the trade secrets and have taken active steps to maintain their secrecy"). Instead, List argues that it has an interest in the alleged trade secrets because it purchased them or, at least, there is an issue of fact as to whether it purchased them. (*See* Doc. No. 62 at PageID 3727-33.)

When jurisdiction is based on diversity of citizenship, as it is here, "state substantive law is used when interpreting contract provisions." *Whitt Mach., Inc. v. Essex Ins. Co.*, 377 F. App'x 492, 495-96 (6th Cir. 2010). Therefore, the Court will apply Ohio law to the PSA.[4] The Sixth Circuit has explained some of the principles for contract interpretation under Ohio law:

> Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial

---

[4] The Court notes that the PSA and Employment Agreement each contain a governing law provision indicating that the agreement should be construed in accordance with Florida law. (Doc. No. 49-3 at PageID 2262.) "[A] federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits." *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 931-32 (S.D. Ohio 2012). And, "[u]nder Ohio law, contractual choice-of-law provisions are valid and enforceable." *Id.* However, "an actual conflict between Ohio law and the law of another jurisdiction must exist for a choice-of-law analysis to be undertaken." *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St. 3d 470, 861 N.E.2d 109, 2006-Ohio-6553, at ¶ 25 (Ohio 2006). The briefing on the Motions from all parties on this issue relies on Ohio law. (*See* Doc. No. 51 at PageID 3088; Doc. No. 62 at PageID 3732-33; Doc. No. 63 at PageID 3788-89.) Additionally, none of the parties have indicated a conflict between Ohio and Florida law on the legal principles applicable to deciding this issue, and the Court is unaware of any such conflict that would affect the outcome of the Motions as set forth in this order. *See, e.g., Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1251-52 (S.D. Fla. 2017) (setting forth principles for contract interpretation under Florida law). Therefore, the Court will apply Ohio law. *See also MP Totalcare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 962 n. 2 (N.D. Ohio 2009) ("Despite the contract's choice of law provision, I apply Ohio law, as the parties agree that no material distinctions exist between the relevant law in Ohio and Florida. Moreover, as both parties rely on Ohio law, they have waived that contractual provision.") (internal citation omitted).

determination by the court. The role of courts in examining contracts is to ascertain the intent of the parties. The intent of the parties is presumed to reside in the language they choose to use in their agreement. Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract. However, extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning. Nevertheless, a court is not permitted to alter a lawful contract by imputing an intent contrary to that expressed by the parties in the terms of their written contract.

Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations. Courts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract. In determining whether contractual language is ambiguous, the contract must be construed as a whole, so as to give reasonable effect to every provision in the agreement. Common words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument. …

If the contract is silent, as opposed to ambiguous, with respect to a particular matter, it is not the function of courts in Ohio to formulate a new contract for the parties. Rather, the parties to a contract are required to use good faith to fill the gap of a silent contract. 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties. What the duty of good faith consists of depends upon the language of the contract in each case which leads to an evaluation of reasonable expectations of the parties.

*Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763-64 (6th Cir. 2008) (applying Ohio law) (internal citations and quotation marks omitted) (modifications adopted).

Under Ohio law, "[i]f a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning-Ferris Indus. Of Ohio, Inc.*, 15 Ohio St. 3d 321, 474 N.E.2d 271, 272 (Ohio 1984). On the other hand, "[i]f the court determines that a contract term is ambiguous, a question of fact for the jury arises." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999) (applying Ohio law); *see also Inland Refuse Transfer Co.*, 474 N.E.2d at 273 ("However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness

14

may be necessary to supply the missing term"). "Furthermore, conflicting provisions in a contract cannot be interpreted as a matter of law." *California Fitness I, Inc. v. Lifestyle Family Fitness, Inc.*, 433 F. App'x 329, 337 (6th Cir. 2011) (applying Ohio law) (internal quotation marks omitted). "Instead, the matter must then be resolved by the fact finder, who must then rely on parol evidence." *Id.* (internal quotation marks omitted).

The Court applies these principles in evaluating the PSA. Construing the PSA as a whole, the Court finds that the relevant language is clear and unambiguous. The PSA's Section 1.2 directs the reader to its Exhibit C-1 as setting forth the assets that the Midwest Entities was selling to List. (Doc. No. 49-2 at PageID 2226.) In turn, Exhibit C-1 states that included in those assets are: "All equipment, orders not yet shipped, contracts, computer software, company names, tradenames, copyrights, marketing materials, patents, websites and other intellectual property of each Seller; a schedule thereof to be provided by Seller [i.e., the Midwest Entities] to Buyer [i.e., List] 5 days from the Effective Date and updated at Closing." (*Id.* at PageID 2249 (PSA Exhibit C-1, ¶ 3).) The Court finds that, based on the PSA's plain language, List owns the alleged trade secrets, as well as all of the Midwest Entities' servers. Such equipment and files fall within the categories in Exhibit C-1 as assets sold by the Midwest Entities to List. (*See also* Doc. No. 46 at PageID 650 (Umina admitting that the servers at the Midwest Factory Warehouse, from which he downloaded files onto his Seagate Hard Drive while employed by List, "were part of the purchase" and "after the sale were owned by List").)

The Defendants' focus on the phrase that follows the semicolon in the above-quoted sentence from Exhibit C-1 is misguided and does not create an ambiguity. That phrase provides a promise by the Midwest Entities (not List) to provide List with a schedule within five days of the

PSA's effective date and to update that schedule at closing.[5]  (Doc. No. 49-2 at PageID 2249.) Whether the Midwest Entities failed to fulfill that promise does not affect the fact that the Midwest Entities sold to List all of their items that fall within the categories listed in Exhibit C-1.[6]  In other words, even if the Midwest Entities broke its promise to provide a schedule, that promise was not a condition precedent to the sale of those categories of items.  *Adkins v. Bratcher*, 2009-Ohio-42, at ¶¶ 30-33  (Ohio Ct. App. 2009) (finding that preparation and delivery of a deed was part of the seller's performance under the purchase contract, not a condition precedent to their performance; explaining that "[c]onditions precedent are conditions which must be performed before the obligations in the contract become effective" and are not favored by the law, and "whenever possible courts will avoid construing provisions to be such unless the intent of the agreement is plainly to the contrary"); *Hiatt v. Giles*, 2005-Ohio-6536, at ¶¶ 23-24 (Ohio Ct. App. 2005) (finding that the purchase agreement obligated the buyers to obtain financing (a promise by the buyers to do so), but did not condition the sale on their doing so, and stating that, "[i]f the parties had intended to structure the transaction to make the sale contingent on the Buyers' ability to secure financing, they easily could have used language to that effect").  Thus, the Court disagrees with Defendants' argument that, "for specific assets (e.g., trade secrets) to be included in the sale, the PSA required the parties to identify those assets in Schedule C-1.3."  (Doc. No. 51 at PageID 3079-80; *see also* Doc. No. 63 at PageID 3788 (Defendants arguing that, "[b]ecause the parties did not identify any intellectual property, no intellectual property transferred").)  According to Defendants' argument, given that there is no Schedule C-1.3 whatsoever, the Midwest Entities

---

[5] Defendants mischaracterize the phrase as requiring that "the <u>parties</u> specifically identify any intellectual property included in the sale on a schedule within 5 days of the effective date of the PSA."  (Doc. No. 63 at PageID 3787 (emphasis added).)

[6] Defendants argue that the schedule referenced in paragraph 3 of Exhibit C-1 of the PSA was never created (Doc. 51 at PageID 3079 (citing Umina Declaration)), while List argues that the schedule is the Bill of Sale (Doc. No. 62 at PageID 3716).

sold no "equipment, orders not yet shipped, contracts, computer software, company names, tradenames, copyrights, marketing materials, patents, websites and other intellectual property" to List. The Court finds Defendants' argument is incorrect. *Savedoff*, 524 F.3d at 763-64. The assets sold by the Midwest Entities to List included all of the categories listed in Exhibit C-1, and those categories encompassed files that Umina downloaded from the servers at the Midwest Factory Warehouse after the sale while he was still employed by List. (Doc. No. 46 at PageID 649-51.)

The Court's conclusion is also supported by other language within the PSA.[7] (*See, e.g., Doc. No. 49-2 at PageID 2225 (indicating the parties' desire to purchase/sell all or substantially all of the assets of the Midwest Entities' business); *id.* at PageID 2226 (stating that the assets to be sold by Midwest Entities to Buyer pursuant to the PSA are "[a]ll or substantially all of the assets owned by [the Midwest Entities] in connection with the ownership and operation of the Business, as set forth on Exhibit C-1 attached hereto"); *id.* at PageID 2226, 2250 (identifying as the "Excluded Assets" only the "Accounts Receivable of Seller").)

Therefore, the Court disagrees with Defendants' argument that List's trade secret claim fails because List "does not own or otherwise have an interest in the alleged secret[s]." (Doc. 51 at PageID 3088.)

## (2) Existence of a trade secret

Defendants also argue that the twelve documents that List claims are the trade secrets at issue do not qualify as trade secrets. (Doc. 51 at PageID 3084.) Defendants assert that the

---

[7] Although not relied on by the Court in coming to its conclusion, even further support is provided in the Bill of Sale's language. (*See* Doc. No. 46 at PageID 2228 (requirement that the Midwest Entities transfer good title to the Assets by a Bill of Sale); Doc. No. 49-4 (executed Bill of Sale transferring, among other things, all rights and interests in all of the Midwest Entities' "equipment, contracts, computer software, marketing materials, patents, websites and other intellectual property" to List).) Furthermore, in the years following the PSA's execution, there is no indication that the parties acted as if the Midwest Entities did not sell assets that fall within those categories to List, despite the Midwest Entities apparently failing to provide List with the schedule referenced in Exhibit C-1. In fact, there is evidence supporting the opposite. (*See, e.g.,* Doc. No. 46 at PageID 650 (Umina admitting that the servers at the Midwest Factory Warehouse "were part of the purchase" and "after the sale were owned by List").)

documents "contain outdated information dating back more than a decade[] and otherwise consist largely of public information distributed to trade show and exhibition attendees." (*Id.*) List responds that whether the documents qualify as trade secrets is an issue of fact. (Doc. No. 62 at PageID 3737-38.)

For purposes of a misappropriation-of-trade-secret claim, the OUTSA states that the term "trade secret" means:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D).

"Whether information constitutes a trade secret is a question of fact." *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 979 (6th Cir. 2021) (quoting *In re Rev. of Alt. Energy Rider Contained in Tariffs of Ohio Edison Co.*, 153 Ohio St. 3d 289, 106 N.E.3d 1, 2018-Ohio-229, at ¶ 35 (Ohio 2018)). The Supreme Court of Ohio has adopted six factors for consideration in determining whether an item constitutes a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.,* by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St. 3d 396, 2000-Ohio-207, 732 N.E.2d 373, 378 (Ohio 2000) (internal quotation marks omitted); *see also MNM & MAK Enters., LLC v. HIIT Fit Club, LLC*, 134 N.E.3d 242, 2019-Ohio-4017, at ¶¶ 23-26 (Ohio Ct. App. 2019) (explaining that the six factors are advisory and no single factor is dispositive).  Information can constitute a trade secret "regardless of the manner, mode or form in which it is stored—whether on paper, in a computer, in one's memory, or in any other medium," and a customer list can constitute a "trade secret" under Ohio Rev. Code § 1333.61(D).  *Al Minor & Assoc., Inc. v. Martin*, 117 Ohio St. 3d 58, 881 N.E.2d 850, 2008-Ohio-292, ¶ 24 (Ohio 2008).

However, a document is entitled to trade secret status "only if the information is not generally known or readily ascertainable to the public."  *State ex rel. Besser*, 732 N.E.2d at 379 (internal quotation marks omitted).  Additionally, "[a] possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status."  *Fred Siegel Co., L.P.A.*, 707 N.E.2d at 862.

Here, Defendants provide evidence that four of the twelve documents are associated with a particular trade show or exhibition, the information came from third-party sources, and the documents merely consist of publicly available information.[8]  (*See, e.g.,* Doc. No. 51-7 at PageID 3141-42.)  In the Opposition, List asserts: "Umina conceded that the information contained in the various customer lists, including the trade show documents, was not publicly available when this information was owned by the Midwest Entities."  (Doc. No. 62 at PageID 3738.)  However, that assertion is not supported by List's cited evidence with respect to the four documents.  (*See id.* (citing portion of Umina deposition); Doc. No. 46 at PageID 663 (cited Umina deposition portion

---

[8] Those four documents are: (1) NSSEA SES-Specifier Pre-Registration List_0125; (2) NSSEA SES-Dealer Pre-Registration List_0125; (3) ABC2009-CDS-FinalList-Exhibitors(1); and (4) school show contacts.  (Doc. No. 51-7 at PageID 3141-42.)

relates to the information contained in MWF_5YRSales_2010.xlsx—not one of the four documents).)  Therefore, the Court finds that there is no genuine issue as to any material fact regarding whether those four documents can be "trade secrets."  They cannot and, therefore, they cannot form the basis of List's OUTSA claim.  *State ex rel. Besser*, 732 N.E.2d at 379; Ohio Rev. Code § 1333.61(D).

However, Defendants do not argue that the other eight documents were ever publicly available.[9]  In fact, Umina specifically admitted that at least some of them constitute customer lists that were not publicly available.  (*See, e.g.,* Doc. No. 46 at PageID 662-63; Doc. No. 49-11; *see also* Doc. No. 49 at PageID 2186-88 (testimony that List had certain restrictions on accessing its electronic information).)  Despite their apparent age, the Court finds that there remain genuine issues of material fact regarding whether any of those eight documents constitute a "trade secret" under Ohio law.  *AtriCure*, 842 F. App'x at 979; *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 987-88 (N.D. Ohio 2008) (finding genuine issues of material fact precluded granting summary judgment on Ohio trade secrets claim, and stating that "[t]he determination of whether information constitutes a trade secret is a highly fact-specific inquiry").

### (3) Misappropriation of the alleged trade secrets

Defendants also argue that they are entitled to summary judgment on Count 1 because there is no evidence to support that Umina engaged in the unauthorized use of any of the remaining eight alleged trade secrets.  (Doc. No. 51 at PageID 3089; *see also id.* at PageID 3092 (asserting that "[t]here is no evidence Umina improperly used or disclosed any information List characterizes as a trade secret").)  In response, List argues that "Umina acquired the information contained on the

---

[9] Those other eight documents are:  (1) 1 – 2006 Top 20 Customers; (2) ABC2008-CDS-FinalList-ExhibitorS; (3) CUSTLIST_011304; (4) Customer List; (5) customerlist_2098; (6) MWF_5YRSales_2010; (7) National_Accounts_2006; and (8) School Show 1 Contact Per Co . List.  (Doc. No. 52-6 at PageID 3225.)

hard drives by 'improper means' in that he downloaded this information from List's servers, without List's permission, and failed to return this information when he left List's employ." (Doc. No. 62 at PageID 3738.) List also argues that "[t]he record evidence shows that Defendants used the information Umina downloaded from List's servers to his personal hard drive." (*Id.* at PageID 3713.)

The OUTSA generally allows a party to seek an injunction for actual or threatened misappropriation of a trade secret and to recover damages for misappropriation of a trade secret. Ohio Rev. Code §§ 1333.62(A), 1333.63(A).[10] The Act defines the term "misappropriation" as meaning <u>any</u> of the following:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

> (2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

>> (a) Used improper means to acquire knowledge of the trade secret;

>> (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

>> (c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(B). The same statute states that "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Ohio Rev. Code § 1333.61(A).

---

[10] Specifically, Ohio Rev. Code § 1333.62(A) states that "[a]ctual or threatened misappropriation may be enjoined," and Ohio Rev. Code § 1333.63(A) states that, "[e]xcept to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant in a civil action is entitled to recover damages for misappropriation."

The Court initially addresses an argument involving the alleged elements of a misappropriation-of-trade-secrets claim under the OUTSA. Defendants argue that "List's trade secrets claim fails as a matter of law [with respect to the remaining eight alleged trade secrets] since it cannot show Umina <u>used</u> them." (Doc. No. 51 at PageID 3089 (emphasis added).) However, as shown in the quoted statutory language above, misappropriation does not necessarily require use of the trade secret.[11] Ohio Rev. Code § 1333.61(B)(1); *see also Allied Erecting and Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 709 (6th Cir. 2015) ("[f]inding liability under the OUTSA requires *misappropriation* of a trade secret—acquisition by improper means, disclosure, or use") (emphasis in original). Yet, at this stage of the litigation, List at least must raise a genuine issue of material fact as to whether the alleged trade secrets were misappropriated, as defined in the OUTSA. Ohio Rev. Code § 1333.61(B); *Aday v. Westfield Ins. Co.*, 486 F. Supp. 3d 1153, 1169 (S.D. Ohio 2020).

The Court finds that List has raised a genuine issue of material fact as to whether Defendants misappropriated List's eight remaining alleged trade secrets. The term "misappropriation" includes "[a]cquisition of a trade secret of another by a person who knows or

---

[11] Both parties cite to *Heartland Home Fin., Inc. v. Allied Home Mortg. Cap. Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008) as setting forth the elements of a misappropriation-of-trade-secrets claim under Ohio law. (*See* Doc. No. 51 at PageID 3087; Doc. No. 62 at PageID 3736.) However, the list of requirements in the *Heartland Home Fin.* case does not fully align with the language of the OUTSA. As the Sixth Circuit later recognized, *Heartland Home Fin.*'s "formulation of the prima facie case is likely outdated in light of the Uniform Trade Secrets Act (UTSA)." *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, 521 F. App'x 453, 457 n. 6 (6th Cir. 2013). More specifically, the *Heartland Home Fin.* case includes "the unauthorized use of a trade secret" as an element. *Heartland Home Fin.*, 258 F. App'x at 861 ("[i]n order to prevail on a misappropriation-of-trade-secret claim, a plaintiff must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret"). The cited support in *Heartland Home Fin.* for its list of elements was *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003), which, in turn, had relied on the decision in *GTI Corp. v. Calhoon*, 309 F. Supp. 762, 767 (S.D. Ohio 1969) from more than thirty years earlier. Yet, the OUTSA (Ohio Rev. Code § 1333.61 *et seq.*) went into effect in 1994. *See also Kendall Holdings*, 521 F. App'x at 457 n. 6 (citing Restatement (Third) of Unfair Competition § 40 cmt. b (1995) as explaining that the UTSA imposes liability not just for the wrongful use or disclosure of a trade secret, as case law often recites, but also for its acquisition by improper means). Therefore, the Court relies on the language of the Ohio statute, not the outdated recitation of elements listed in the *Heartland Home Fin.* case.

has reason to know that the trade secret was acquired by improper means." Ohio Rev. Code § 1333.61(B)(1). The Court finds that there are genuine issues of material fact regarding both whether Umina's acquisition of the alleged trade secrets was "by improper means" and whether Umina knew or had reason to know that the alleged trade secrets were acquired by improper means. *See Boehm v. Black Diamond Casino Events, LLC*, 116 N.E.3d 704, 2018-Ohio-2379, at ¶¶ 9-10 (Ohio Ct. App. 2018) (former employee "breached his duty to maintain secrecy of the records by retaining them for himself beyond the period for which he had [former employer's] consent," and his "retention of records that he had an obligation to return, even though he kept them to prepare for litigation, was a misappropriation under" the OUTSA); *MNM & MAK Enters.,* 2019-Ohio-4017, at ¶¶ 29-30 (explaining that "express consent to access trade secret information in the course of employment does not also confer express or implied consent to use the information for non-work, personal purposes" and holding that "[t]he presence of an explicit, binding confidentiality or employment agreement is not required to find misappropriation of a trade secret").

As referenced above, "improper means" includes "breach … of a duty to maintain secrecy." Ohio Rev. Code § 1333.61(A). The Employment Agreement between List and Umina is dated October 12, 2010 and included a non-disclosure provision. That provision states, in part, that Umina "shall not at any time, whether during <u>or after</u> his Employment under this Agreement, either directly or indirectly, divulge[,] disclose, or communicate to any person, firm or corporation any information relating to the business or affairs of the Company which is confidential, proprietary, or not in the public domain." (Doc. No. 49-3 at PageID 2259 (emphasis added).) The Employment Agreement also required Umina to "return <u>all</u> property, materials, files and any other Company owned information to the Company" upon termination of his employment with List. (*Id.* at PageID 2261 (emphasis added).)

Umina admitted that, at some point while he was employed by List, he downloaded files from the servers at the Midwest Factory Warehouse onto his Seagate Hard Drive. (Doc. No. 46 at PageID 649-50; *see also* Doc. No. 51 at PageID 3080; Doc. No. 63 at PageID 3784.) The Seagate Hard Drive contained all twelve (now eight) of the alleged trade secrets. (Doc. No. 62-3 at PageID 3770; *see also* Doc. No. 62-1 at PageID 3753 (Defendants admitting that files named "Customer List.xls" and "CUSTLIST_011304.xls"—two of the eight remaining alleged trade secrets—are saved on the Seagate Hard Drive).) Umina also admitted that he purchased the Seagate Hard Drive after November 23, 2010. (Doc. No. 49-2 at PageID 2240, 2242-43; Doc. No. 62-1 at PageID 3749.) Therefore, any uploading or copying of files to the Seagate Hard Drive would have taken place after List bought the Midwest Entities' assets and after Umina had entered into the Employment Agreement—and, therefore, while Umina was subject to the restrictions in the Employment Agreement.

Defendants fail to show that Umina was not subject to the non-disclosure provision when he acquired the alleged trade secrets. Defendants argue that, "[a]s a List employee assigned to work for MFH, List authorized Umina to access customer information" and "expressly permitted him to take information about Midwest Entities' customers in order to collect on outstanding accounts." (Doc. No. 51 at PageID 3092.) However, there is a question of fact regarding whether such information would include the alleged trade secrets. Umina testified that he "didn't know what [he] would need, so [he] didn't pick the documents that [he] thought [he] might need," resulting in him "basically download[ing] a drive of files." (Doc. No. 46 at PageID 650-51.) Additionally, Umina could not remember whether he had asked anyone at List if it was okay for him to download that information from the servers and take it with him. (*Id.*)

The Court also finds that there is a genuine issue of material fact regarding whether

Defendants disclosed or used the alleged trade secrets (without List's consent) after Umina used improper means to acquire knowledge of those trade secrets. Ohio Rev. Code. § 1333.61(B)(2)(a) (defining "misappropriation" also to include "[d]isclosure or use of a trade secret of another without the express or implied consent of the other person by a person who … [u]sed improper means to acquire knowledge of the trade secret"). Umina admitted that he used information that was contained on the Seagate Hard Drive (which, again, contained all of the alleged trade secrets) to identify potential customers for Top Tier's products, and he admitted that he used some school contact lists to create an email list for Top Tier. (*See, e.g.,* Doc. No. 46 at PageID 680; Doc. No. 62-1 at PageID 3762.) Umina also testified that he looked at four files from the Seagate Hard Drive in creating an email list for Top Tier and that he used some of the information from those four files. (Doc. No. 46 at PageID 680; *id.* at PageID 656 (Umina testifying that he looked at ABC2008-CDS-FinalList-ExhibitorS—one of the eight remaining alleged trade secrets—at some point after forming Top Tier for the purpose of developing an email list or a contact list).) Without denying that he did, Umina could not recall using any more than those four files to identify potential customers for Top Tier's products. (*Id.* at PageID 680; *see also id.* at PageID 670 (Umina testifying that he does not know whether or not he used School Show 1 Contact Per Co. List—another one of the eight remaining alleged trade secrets—to create an email prospecting list for Top Tier).)

Additionally, Krumholtz, a Top Tier employee, testified that, during the time Top Tier was being formed, Umina had a hard drive that may have contained some Midwest Entities files. (Doc. 47 at PageID 1623-24.) Umina also acknowledged that he used a OneDrive cloud storage service in his work for Top Tier, although he could not recall whether he ever uploaded any documents from the Seagate Hard Drive to that cloud storage service. (Doc. No. 46 at PageID 658-59.) Dr.

Cobb's analysis revealed that the Seagate Hard Drive was accessed in 2016, 2017, and 2018, and revealed that the OneDrive cloud storage service was accessed by Umina's laptop and desktop on 190 occurrences starting in 2017. (Doc. No. 62-4 at PageID 3775.)

In summary, a number of genuine issues of material fact remain regarding List's misappropriation-of-trade-secrets claim. Therefore, the Court denies Defendants' motion for summary judgment with respect to Count 1. *See Thermodyn*, 593 F. Supp. 2d at 987-88 (denying motion for summary judgment on Ohio trade secret claim; finding that whether the alleged trade secrets were trade secrets and whether there was misappropriation—specifically, whether defendant former employee provided any of the alleged trade secrets to defendant competitor— were "highly fact-sensitive inquiries more appropriately resolved by the trier of fact").

### B. **Breach of Contract (Count 2)**

The second count in the Complaint is for Breach of Contract against Umina. (Doc. No. 35 at PageID 415-17.) Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a binding contract or agreement; (2) the non-breaching party's performance of its contractual obligations; (3) the other party's failure to fulfill its contractual obligations without legal excuse; and (4) the non-breaching party suffered damages as a result of that failure. *Lawrence v. Lorain Cnty. Cmty. Coll.*, 127 Ohio App. 3d 546, 713 N.E.2d 487, 548-49 (Ohio Ct. App. 1998); *Feltner v. Vill. of Whitehouse*, 114 N.E.3d 747, 2018-Ohio-2337, at ¶ 23 (Ohio Ct. App. 2018).

Umina makes two arguments in support of his request for summary judgment on this claim. (Doc. No. 51 at PageID 3092-93.) First, he argues that "List does not own the documents it claims [he] kept and/or disclosed." (*Id.*) The Court essentially addressed this argument in its analysis of the misappropriation-of-trade-secrets claim, above. The Court finds that, based on the PSA's plain language, List owns the files that Umina downloaded from the servers at the Midwest Factory

Warehouse after the sale and while he was still employed by List. This would include, but not limited to, all of the alleged trade secrets.

Second, Umina argues that "there is no evidence [he] disclosed the documents to anyone." (Doc. No. 51 at PageID 3092.) As an initial matter, separate from the non-disclosure provision, the Employment Agreement required Umina to "return <u>all</u> property, materials, files and any other Company owned information to the Company" upon termination of his employment with List in April of 2011. (Doc. No. 49-3 at PageID 2261 (emphasis added); Doc. No. 46 at PageID 649.) At the absolute least, there is a genuine issue of material fact regarding whether that provision applied to the files that Umina admits he kept after downloading them onto the Seagate Hard Drive while employed by List. (Doc. No. 46 at PageID 649-50; *see also* Doc. No. 51 at PageID 3080; Doc. No. 63 at PageID 3784.) Although Umina asserts that he "needed to keep certain information about the customers to collect on the outstanding accounts (*e.g.*, customer names, contact information, purchase information, *etc.*)" (Doc. No. 63 at PageID 3795), he offers no evidence that he obtained a waiver of his contractual obligations, and he admitted that he indiscriminately downloaded files from the server(s) owned by List. (Doc. No. 46 at PageID 650-51 (Umina testifying that he "didn't know what [he] would need, so [he] didn't pick the documents that [he] thought [he] might need," resulting in him "basically download[ing] a drive of files").) Umina also does not show—or even argue—that he ever returned those files, some (if not all) of which remained on his Seagate Hard Drive even in 2020 when Umina answered requests to admit in this case. (Doc. No. 62-1 at PageID 3753.)

Moreover, Umina's argument reads the non-disclosure provision too narrowly. Again, that provision states, in part, that Umina "shall not at any time, whether during or after his Employment under this Agreement, either directly or indirectly, divulge[,] disclose, or communicate to any

person, firm or corporation any information relating to the business or affairs of the Company which is confidential, proprietary, or not in the public domain." (Doc. No. 49-3 at PageID 2259.) As shown above in the Court's analysis of Count 1, there are issues of fact related to whether Umina (at least) indirectly divulged or disclosed to Top Tier any information relating to List's business or affairs that is not in the public domain.

In summary, genuine issues of material fact preclude granting Umina summary judgment on the breach of contract claim. Therefore, the Court denies Umina's motion for summary judgment with respect to Count 2.

### C. **Spoliation (Count 3)**

The third count in the Complaint is for spoliation under Ohio law. (Doc. No. 35 at PageID 417-18.) Defendants argue that "there is no evidence Umina destroyed the [Toshiba] device" and, even "[a]ssuming List could establish destruction, its spoliation claim still fails because there is no evidence showing any destruction was the result of willful conduct" and "there is no evidence its case has been disrupted and it suffered damage." (Doc. No. 51 at PageID 3093-94.)

Ohio recognizes a cause of action in tort for spoliation of evidence (interference with or destruction of evidence). *Smith v. Howard Johnson Co., Inc.*, 67 Ohio St. 3d 28, 1993-Ohio-229, 615 N.E.2d 1037, 1038 (Ohio 1993). To recover on such a claim, "a plaintiff must prove all of the following elements: (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *O'Brien v. Olmsted Falls*, 2008-Ohio-2658, at ¶ 17 (Ohio Ct. App. 2008) (citing *Smith*, 615 N.E.2d at 1038).

Defendants do not contest the first two elements in their Motions. Regarding the third element, the term "'willful' reflects an intentional and wrongful commission of the act"—thus,

more than "mere negligence or failure to conform to standards of practice." *White v. Ford Motor Co.*, 142 Ohio App.3d 384, 755 N.E.2d 954, 957 (Ohio Ct. App. 2001). Circumstantial evidence can support a finding that evidence was willfully destroyed. *See, e.g., Sheets v. Norfolk S. Corp.*, 109 Ohio App. 3d 278, 671 N.E.2d 1364, 1370 (Ohio Ct. App. 1996) (circumstances in the case presented a question for the jury as to whether the defendants willfully destroyed the evidence). Additionally, "[t]he intent of an alleged spoliator can be inferred from the surrounding circumstances." *Jaro Transp. Servs., Inc. v. Grandy*, No. 4:03-CV-01227, 2006 U.S. Dist. LEXIS 62932, 2006 WL 2553424, at *11 (N.D. Ohio Sept. 5, 2006) (applying Ohio law); *see also Stratacache, Inc. v. Wenzel*, 2019-Ohio-3523, at ¶ 36 (Ohio Ct. App. 2019) ("[i]n cases involving the alleged spoliation of evidence, the intent of the spoliator in destroying or altering evidence can be inferred from the surrounding circumstances") (internal quotation marks omitted).

Regarding the damages requirement, a party claiming spoliation cannot show damages "where the evidence alleged to be willfully destroyed … would not have changed the result of an unsuccessful underlying case, and no other damages are alleged." *Heimberger v. Zeal Hotel Grp., Ltd.*, 42 N.E.3d 323, 2015-Ohio-3845, at ¶ 38 (Ohio Ct. App. 2015). An example of such a situation would be where a defendant is found to have satisfied its duty of care in the underlying negligence claim and the allegedly destroyed records could not show otherwise. *Id.*; *Kemme v. Seltzer Holdings, LLC*, 2020-Ohio-3142, at ¶ 24 (Ohio Ct. App. 2020) (premises condition found to be open and obvious, thereby negating the duty element of the underlying negligence claim regardless of what the alleged destroyed evidence might demonstrate regarding who created the condition).

Umina received and read the Preservation Letter in 2016. (Doc. No. 46-2; Doc. No. 46 at PageID 661.) In his 2018 deposition in the Florida litigation, Umina testified that he thought the

device he used to take files back-and-forth from work to home was a Toshiba device, that device was at his home, and—to the best of his knowledge—it would include all of the documents he would have had in relation to his prior employment at Midwest Factory (one of the Midwest Entities). (Doc. No. 33-2 at PageID 367-69.) Defendants assert that Umina's "reference to a Toshiba device" during that deposition "was simply a mistake" and that Umina never possessed or used a Toshiba USB device. (Doc. No. 51 at PageID 3094; Doc. No. 46 at PageID 625; Doc. No. 62-1 at PageID 3762.)

However, Dr. Cobb's analysis of Umina's desktop computer, laptop computer, Seagate Hard Drive, and a USB flash drive revealed the existence of a Toshiba USB device. (Doc. No. 62-4 at PageID 3778.) It also revealed that the Toshiba USB device was used to access "a number of files" from Umina's desktop computer in both February of 2016 (around the time when Top Tier was formed) and October 2016 (more than three months after the date of the Preservation Letter). (Doc. No. 62-4 at PageID 3778-79, 3782-83.) And, Dr. Cobb's analysis supports that files owned by List were among the files that had been accessed with the Toshiba USB device in 2016. (*Id.*; Doc. No. 46 at PageID 626, 656-58.) Evidence supports that Umina and Krumholtz created mailings lists of potential customers for Top Tier and that Umina also helped put together a customer list for Top Tier —a competitor to List. (Doc. No. 46 at PageID 627; Doc. No. 47 at PageID 1619, 1627.)

The Court finds that there are genuine issues of material fact regarding whether the Toshiba device existed, whether Umina destroyed it, and whether any such destruction was willful and designed to disrupt List's case. To create an issue of fact (or to succeed on the spoliation claim), List does not need to have a video showing Umina destroying the Toshiba device and a taped confession stating that he destroyed the device intentionally to disrupt List's chances of succeeding

in this litigation. Given the nature of spoliation, such direct evidence is both unlikely to exist and unnecessary to recover on the claim. *Sheets*, 671 N.E.2d at 1370; *Jaro Transp. Servs.*, 2006 WL 2553424, at *11.

Umina's explanation for why he did not preserve the Toshiba device despite having previously received and read the Preservation Letter (i.e., that the device never existed) appears to conflict with Dr. Cobb's findings. In addition to the circumstances set forth above, Umina's 2018 testimony came before he was compelled to turn over forensic images of his devices (Doc. No. 24), but after he received and read the Preservation Letter. *See Jaro Transp. Servs.*, 2006 WL 2553424, at *11 (finding that conflicting evidence regarding the alleged destruction of evidence allowed a fair inference that the missing data had been destroyed, and "[t]he fact that the loss of the data occurred while the lawsuit was in full swing and discovery was underway may give rise to suspicion and inferences of foul play"). And, the question of intent "is ultimately a matter of weighing all the relevant evidence and the credibility of witnesses," which "is a task within the province of the jury." *Id.* Drawing all reasonable inferences in List's favor, a jury could reasonably find for List on the third element of its spoliation claim. *See id.*; *Ed Schmidt Pontiac-GMC Truck, Inc. v. Chrysler Motors Co., LLC*, 575 F. Supp. 2d 837, 841 (N.D. Ohio 2008) (denying motion for summary judgment on Ohio spoliation claim; finding that "a jury might fairly infer that" data was destroyed and that such destruction was deliberate); *Actionlink, LLC v. Sorgenfrei*, No. 5:08CV2565, 2010 U.S. Dist. LEXIS 6703, 2010 WL 395243, at *5 (N.D. Ohio Jan. 27, 2010) (finding that a material issue of fact existed regarding Ohio spoliation claim "as to whether [defendant] willfully, negligently, or not at all, destroyed evidence on the laptop … in an attempt to disrupt [plaintiff's] case").

Next, regarding whether any such destruction actually did disrupt List's case and cause

damages, the Court again finds genuine issues of material fact that preclude granting Defendants judgment as a matter of law on the spoliation claim. It would be reasonable for a jury to credit Umina's initial testimony during his 2018 deposition in the Florida litigation that a Toshiba portable device contained the documents he had regarding the Midwest Entities, and to find that the Toshiba USB device identified through Dr. Cobb's forensic investigation—a device that had existed since at least 2006, been accessed from Umina's desktop in 2016, and been used to access at least some former Midwest Entities' documents in 2016—was the same one Umina referenced in his 2018 testimony. As shown above, List's first two claims rely on documents that qualify as "trade secrets" in accordance with the OUTSA (Count 1) or "information" in accordance with the Employment Agreement (Count 2). Being able to increase the scope of documents that so qualify would be beneficial to List's claims. Thus, taking actions to limit the scope—including through destroying a device that evidence indicates accessed at least some files owned by List during the relevant timeframe—would disrupt List's case. It also could affect the amount of damages List can establish for its misappropriation-of-trade-secrets claim and its breach of contract claim. *See Actionlink*, 2010 WL 395243, at *5 (courts should "keep in mind that holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would allow parties who have intentionally destroyed evidence to profit from that destruction") (internal quotation marks omitted) (modification adopted). Thus, drawing all reasonable inferences in List's favor, the Court finds that a jury also could reasonably find for List on the fourth and fifth elements of its spoliation claim. *Id.* (denying motion for summary judgment on spoliation claim that related to underlying claims of misappropriation-of-trade-secrets and breach of confidentiality agreement); *Hicks v. Bryan Med. Grp.*, 287 F. Supp. 2d 795, 811 (N.D. Ohio 2003) (denying defendant's motion for summary judgment on Ohio spoliation claim; genuine issue of material

fact existed where plaintiff may not have settled other litigation—or may have settled other litigation for a lesser amount—had the alleged alteration of a document not happened).

In summary, genuine issues of material fact preclude granting Defendants summary judgment on the spoliation claim. Therefore, the Court also denies the Motions with respect to Count 3.

## IV. <u>CONCLUSION</u>

For the reasons stated above, the Court finds that neither Umina nor Top Tier are entitled to summary judgment on any of the claims against them. Therefore, the Court **DENIES** the Motion for Summary Judgment of Defendant Dean Scott Umina (Doc. Nos. 51 and 52) and the Motion for Summary Judgment of Defendant Top Tier Storage Products, LLC (Doc. No. 53). This action will continue in accordance with the pretrial scheduling order.

**DONE** and **ORDERED** in Dayton, Ohio, this Friday, July 2, 2021.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE